**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | | |
|---|---|---|
| **KATHLEEN FREDERICKS,** | § | |
| **individually and on behalf of all others,** | § | |
| **similarly situated,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:23-cv-01042-PAD** |
| | § | |
| **AMERIFLIGHT, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

## AMERIFLIGHT'S MOTION TO DISMISS AND BRIEF IN SUPPORT

Defendant Ameriflight, LLC ("Ameriflight") files this Motion to Dismiss and Brief in Support ("Motion") and states:

## OVERVIEW

1.  Plaintiff Kathleen Fredericks ("Plaintiff") filed this putative collective action on January 30, 2023, alleging statutory causes of action against Ameriflight, her former employer, for violation of the Fair Labor Standards Act ("FLSA") and the Texas Covenants Not to Compete Act, and for declaratory judgment. These claims arise out of a Training and Employment Agreement (the "Agreement") that governed the terms of Plaintiff's employment with Ameriflight. As discussed in further detail below, in the Agreement, Ameriflight promised to provide Plaintiff with valuable training to qualify her to fly the Beechcraft 99 aircraft as a Captain. Ameriflight agreed to bear the $20,000 cost of the training, subject to Plaintiff's promise to repay the cost if she resigned her employment with Ameriflight within a certain number of months after becoming qualified.

2.  Plaintiff received the training, became qualified, and then quit Ameriflight for another job opportunity. Prior to receiving a demand of any kind from Ameriflight, Plaintiff

acknowledged the debt, requested and received a payment plan, and made small payments toward her debt for over a year before retaining counsel and filing this action. She has continued to make payments. She contends that the repayment terms of the Agreement violate the FLSA because (1) they constitute an illegal "kickback" of wages, resulting in Plaintiff's wages falling below minimum wage in her final week of work and (2) they mean that Plaintiff's wages were not paid "free and clear" or "finally and unconditionally," also resulting in a minimum wage violation under Plaintiff's theory of the case. Plaintiff also contends that the Agreement is an unlawful restraint on trade in violation of the Texas Covenants Not to Compete Act, and seeks a declaratory judgment that the repayment obligation in the Agreement is an unlawful "penalty." Ameriflight denies these allegations in their entirety. In this Motion, Ameriflight seeks dismissal of all of Plaintiff's claims pursuant to Rule 12(b)(6), because Plaintiff fails to state a claim upon which relief may be granted under any of her theories of recovery. Additionally and in the alternative, Ameriflight seeks dismissal of Plaintiff's request for declaratory relief pursuant to Rule 12(b)(1), because the Court lacks jurisdiction to render the sort of purely advisory opinion Plaintiff requests.

## **PROCEDURAL HISTORY**

3.       Plaintiff filed her Class Action Complaint ("Complaint") (doc. 1) on January 30, 2023. On March 20, 2023, Ameriflight filed its Unopposed Motion for Extension of Time (doc. 19), in which it asked the Court to extend Ameriflight's deadline to answer or otherwise respond to the Complaint by 30 days. The Court granted the Motion for Extension of Time and established a new deadline of April 24, 2023 (doc. 20). Now, prior to the filing of any other pleading, Ameriflight timely seeks dismissal of Plaintiff's FLSA claims pursuant to Federal Rule 12(b).

## THE AGREEMENT

4. It is axiomatic that in ruling on a motion to dismiss for failure to state a claim, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties . . . for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). Plaintiff elected not to attach a copy of the Agreement to the Complaint. However, she referred to the Agreement throughout the Complaint and quoted from it extensively, both in the general "class" allegations and those specific to Plaintiff's individual claims. *See* Complaint (doc. 1) ¶¶ 44-54 (general) and 60-73 (Plaintiff). The Agreement forms the basis of Plaintiff's FLSA claims. *Id.* ¶¶ 85-101. It is alleged to be an unlawful contract in restraint of trade. *Id.* ¶¶ 102-113. Plaintiff asks the Court to declare portions of the Agreement unenforceable. *Id.* ¶¶ 114-117. Accordingly, the Court may consider the Agreement for purposes of this Motion without converting it into a motion for summary judgment. A true and correct copy of the Agreement is attached as Exhibit A and incorporated herein by reference.

## FACTS

5. Plaintiff has alleged the following facts, which the Court and Ameriflight must presume to be true for purposes of this Motion. Plaintiff accepted an offer to work for Ameriflight in Puerto Rico in April 2021. [Complaint (doc. 1) ¶ 58.] Plaintiff accepted the offer and began working for Ameriflight on May 10, 2021. *Id.* Ameriflight sent Plaintiff a copy of the Agreement, which she signed and sent back. *Id.* ¶ 60. The Agreement required Ameriflight to provide training

to Plaintiff at its expense, but required her to repay that amount if she left Ameriflight before completing twelve months of revenue flying. *Id.* ¶ 61; *see* Exhibit A.

6.     Plaintiffs and other pilots are considered Ameriflight employees even while undergoing training, and are paid $12.50 per hour during that time. *Id.* ¶ 37. Plaintiff received and completed the training called for in the Agreement by July 2021. *Id.* ¶ 64. After Plaintiff completed training, she began earning a salary of approximately $55,000. *Id.* ¶ 66.

7.     Plaintiff voluntarily resigned from Ameriflight in November 2021. *Id.* ¶ 67. During her last full pay period of work – which accounted for two full weeks of work – Ameriflight paid Plaintiff $2,500. *Id.* ¶ 71. During her last full week of work, Ameriflight paid her $1,300. *Id.*[1] In email exchanges after her resignation, Plaintiff asked Ameriflight to allow her to pay off her debt to Ameriflight at a rate of $250 per month. *Id.* ¶ 69. Ameriflight accepted this offer. *Id.* Plaintiff alleges that from January 2022 through January 2023 (*i.e.*, the month she filed suit), she made monthly payments totaling approximately $3,250. *Id.* ¶ 70. She has continued to pay during the pendency of this lawsuit.

## STANDARD OF REVIEW

8.     Federal Rule of Civil Procedure 12(b)(6) "provides that defendants may move to dismiss an action for failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter 'to state a claim for relief that is plausible on its face.'" *Reynoso v. DeJoy*, --- F. Supp. 3d ---, 2023 WL 2232107, at *2 (D.P.R. Feb. 27, 2023) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A Court must decide whether the complaint alleges sufficient facts to 'raise a right to relief above the speculative

---

[1] This is a rate of $67,000 per year, far in excess of the $55,000 annual salary Plaintiff alleges she received.

level.'" *Id.* (quoting *Twombly*, 550 U.S. at 555)). "In doing so, a court is 'obligated to view the facts of the complaint in the light most favorable to the plaintiffs, and to resolve any ambiguities in their favor.'" *Id.* (quoting *Ocaso-Hernández v. Fortuño-Burset*, 640 F.3d 1, 17 (1st Cir. 2011)). As discussed above, the Court "must also consider . . . 'implications from documents attached to or fairly incorporated into the complaint[.]'" *Id.* (quoting *Schatz v. Republican State Leadership Cmte.*, 669 F.3d 50, 55-56 (1st Cir. 2012)).

9.      The Court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Id.* (quoting *Zenón v. Guzmán*, 924 F.3d 611, 615-616 (1st Cir. 2019)). The Court's task, after disregarding formulaic recitations of the elements, is to decide whether Complaint states a plausible claim for relief. "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [a court] to draw on [its] judicial experience and common sense." *Zenón*, 924 F.3d at 616. Plaintiff "shoulders the burden of alleging a plausible cause of action." *Rodríguez-Wilson v. Banco Santander de Puerto Rico*, 501 F. Supp. 3d 53, 56 (D.P.R. 2020). When the plaintiff's "allegations do not support plaintiff's theory" of recovery, dismissal is appropriate. *Rodriguez-Luna v. Finance of America Reverse*, Civil No. 20-1182 (PAD), 2021 WL 3889286, at *5 (D.P.R. Aug. 31, 2021). Such is the case here.

## ARGUMENT AND AUTHORITY

**A.      The Court should dismiss Plaintiff's FLSA claims because Plaintiff *admits* that Ameriflight paid her full wages, which were far in excess of the federal minimum, and never deducted any amounts from its wage payments.**

10.      Plaintiff is not the first litigant to ask a federal court to hold that a training and employment agreement like the Agreement violates the FLSA. Prior attempts have been unsuccessful. The leading case on point is *Gordon v. City of Oakland*, 627 F.3d 1092 (9th Cir. 2010). The plaintiff in *Gordon* was a police officer. When she was hired, she became subject to a

collective bargaining agreement which provided that "officers who voluntarily separate from the City's employment prior to completing five years of service must repay a pro rata share of their police academy training costs." *Id.* at 1093. The agreement stated that the cost of training was $8,000 and that "any repayment is due at the time of the officer's separation." *Id.* The plaintiff accepted an offer of employment, attended the police academy, successfully completed training, and became a police officer for the city for about two years before resigning. *Id.* at 1093-1094. At the time she resigned, the plaintiff received a paycheck for her final two workweeks at her full rate of pay. *Id.* at 1094. The city withheld payment of accrued vacation and PTO and made a demand for the remaining balance of about $5,000, which the plaintiff later paid. *Id.*[2]

11.     The plaintiff sued and alleged that the repayment agreement and her after-the-fact compliance with it resulted in a minimum wage violation. *Id.* The district court granted the city's motion to dismiss, and the Ninth Circuit affirmed. The court explained:  "the issue in this case is whether the . . . training reimbursement agreement, which required [plaintiff] to repay $6,400 at the time of her resignation, caused her to receive less than the federal minimum wage during her final workweek." *Id.* at 1095. The plaintiff argued that "there is no legal difference between deducting a sum from an employee's check and directly demanding the employee surrender a sum after being paid," and maintained that "after subtracting the costs she paid to the City for the training program, she was actually paid a negative sum for her last week of work." *Id.* The district court and the Ninth Circuit rejected this argument.

12.     As the Ninth Circuit explained, because the plaintiff "did not allege she was paid below the federal minimum wage for any given week," the only way she could have stated a

_____

[2] The City conceded that if it had withheld the plaintiff's *entire* final paycheck, it would have resulted in an FLSA violation. That did not happen, either in *Gordon* or in the present case.

cognizable claim "is if her payment to the City for a portion of the training costs is a 'kick-back' payment" of the type made unlawful under certain DOL regulations also relied upon by Plaintiff in attacking the Agreement. *Id.* at 1095. It was not. The court explained why:

> The $5,268.03 payment [the plaintiff] made to the City is ***repayment of a voluntarily accepted loan, not a kick-back.*** Instead of requiring applicants to independently obtain their police training prior to beginning employment . . . the City elected to essentially loan police officer trainees like [the plaintiff] the cost of their police academy training. The Conditional Offer [the plaintiff] signed explained that the City would forgive her repayment obligation at the specified rate and that she would owe nothing after five years of service. [The plaintiff], however, chose not to serve the five years necessary to secure complete forgiveness. ***Despite the debt [the plaintiff] owed following her resignation, the City satisfied the FLSA's requirements by paying [the plaintiff] at least minimum wage for her final week of work. The City was therefore free to seek repayment of [the plaintiff's] training debt as an ordinary creditor***.

*Id.* at 1096.[3] Accordingly, because the plaintiff's repayment of her training costs was not a "kick-back" and did not violate the rule requiring wages to be paid "free and clear," the training agreement did not violate the FLSA. *Id.*

13.     The *Gordon* court relied in part on the Seventh Circuit's equally well reasoned decision in *Heder v. City of Two Rivers, Wisconsin*, 295 F.3d 777 (7th Cir. 2002). In *Heder*, the city-employer decided that "all of its firefighters must be certified as paramedics," and that the city would bear most of the cost of the training, subject to an agreement that "any firefighter leaving the City's employ within the next three years would reimburse the City for the cost of the training, which would give each firefighter a portable credential." *Id.* at 778. The lead plaintiff in the putative collective action quit after two and a half years. *Id.* Unlike in *Gordon* and unlike Ameriflight, the city withheld *all* of the departing firefighter's pay from his last two pay periods. *Id.* It ought not have done so, and eventually conceded that the employee was "entitled to keep any

---

[3] All emphasis supplied by counsel unless otherwise indicated.

compensation that the FLSA specifies as a statutory floor," *i.e.*, "at least the statutory minimum wage for his final two pay periods (***leaving the City to collect any residue as an ordinary creditor***)[.]" *Id.* at 778-779.

14.     With that proviso, the agreement was logical and lawful, as the court explained in the context of concluding that the agreement did not violate Wisconsin's covenants not to compete act. The court noted that the city or other employers in its position could "require the employees to undergo and underwrite their own training, with *none* of the time compensated. This is what law firms do when they limit hiring to persons who already have law degrees[.]" *Id.* at 781 (emphasis original). An employer "could require the worker to pay for his own training but lend the worker the money and forgive repayment if he sticks around. A worker who left before the loan had been forgiven would have to come up with the funds from his own sources[.]" *Id.*[4] "If that system is lawful, as it is, then the economically equivalent system that [the city] adopted must be lawful. The cost of training equates to the loan, repayment of which is forgiven after three years." *Id.* at 781-782. By that logic, if the city had not erred by withholding the employee's entire final paycheck, the agreement in question would not have constituted an FLSA violation, because the repayment obligation had nothing to do with *wages*. It was a loan agreement between the debtor-employee and the creditor-employer, and the employer was entitled to collect on it in the ordinary course. *Id.*

15.     Ameriflight, *having paid Plaintiff her full wages for the final two weeks of work*, is in the same position as the employers in *Gordon* and *Heder*. Collecting on what was for all

---

[4] Indeed, had Ameriflight done it this way, it arguably *could* have withheld Plaintiff's entire final paycheck without violating the FLSA. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2004 WL 3177896, at *1 (Oct. 8, 2004) ("where an employer makes a loan or an advance of wages to an employee, the principal may be deducted from the employee's earnings even if such deduction cuts into the minimum wage . . . due to the employee under the FLSA").

practical purposes a loan to Plaintiff does not violate the FLSA. *See, e.g.*, *Bland v. Edward D. Jones & Co.*, 375 F. Supp. 3d 962, 977 (N.D. Ill. 2019) (relying on *Gordon* and *Heder* and dismissing plaintiff's FLSA claims, where actual payment of minimum wage was not in dispute, because "at bottom, the contract and the parties' performance pursuant to it resulted in Plaintiffs' accrual of a debt that Defendants are entitled to collect"). Plaintiff admits in the Complaint that Ameriflight paid her $2,500 in gross wages for her final full pay period, and $1,300 in gross wages for her last week of work. Plaintiff does *not* allege that Ameriflight withheld or attempted to withhold any amount from these paychecks or any other in satisfaction of the debt.[5] Plaintiff does *not* allege that Ameriflight ever demanded immediate repayment in full.

16.  Plaintiff admits that she proactively reached out to Ameriflight after quitting her job and offered to pay off the debt – an implicit acknowledgment that the debt was just and owing – at the rate of $250 per month. Plaintiff received every penny of wages due to her for work she performed, and she was paid nearly four times the federal minimum wage for that work. Plaintiff agreed at the outset of her employment that she would repay Ameriflight the cost of training if she voluntarily resigned prior to completing twelve months of revenue work, and just like the plaintiff-employers in *Goron*, *Heder*, and *Park*, Ameriflight was and remains entitled to collect that debt just like any other creditor.[6] Plaintiff has not alleged facts that would support recovery under any aspect of the FLSA, and the Court should dismiss those claims with prejudice.[7]

---

[5] Of course, Ameriflight made the usual tax withholdings.

[6] Plaintiff argues, or at least insinuates, that $20,000 is not a reasonable estimate of the actual training costs. Even if that were true (it isn't), it would at most be a defense to payment if Ameriflight were to take legal action to collect the debt. The allegation and argument have no relevance whatsoever to Plaintiff's FLSA claim. *See Bland*, 375 F. Supp. 3d at 978.

[7] Plaintiff has asserted two nominally separate causes of action, both arising under 29 U.S.C. § 216, namely, that repayment of training costs is an "illegal kickback of wages" to Ameriflight, and that by requiring repayment, Ameriflight failed to pay wages "finally and unconditionally" or "free and clear." [Complaint (doc. 1) ¶¶ 88 (kickback) and 98 (free and clear).] These are two sides of the same coin. "Whether in cash or in facilities, 'wages' cannot be

**B.** **The Court should dismiss Plaintiff's claims under the Texas Covenants Not to Compete Act because the Agreement** *is not a covenant not to compete*.

17.     Plaintiff's third cause of action asserts that the Agreement is an unlawful restraint of trade in violation of Section 15.05(a) of Texas Business & Commerce Code. [Complaint (doc. 1) ¶¶ 102-113.] Plaintiff seeks a declaration of invalidity, an injunction against future enforcement, and damages, including recovery of amounts already paid. *Id.* There is no dispute that Texas substantive law governs the Parties' relationship in general and the Agreement in particular. *See* Exhibit A at p. 1 (choice of law provision); Complaint (doc. 1) ¶ 51.

18.     As a general rule, "every contract, combination, or conspiracy in restraint of trade or commerce is unlawful" in Texas. Tex. Bus. & Com. Code § 15.05(a). There is a statutory exception, which provides that notwithstanding the general rule, a "covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that area reasonable and do not impose a greater restraint than is necessary to protect the goodwill of the employee or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50(a). Plaintiff contends that the repayment provisions of the Agreement are unlawful under Section 15.05 and do not fall within the exception provided in Section 15.50. Plaintiff is mistaken.

19.     The Court should dismiss this cause of action because the Agreement is ***not*** a restraint of trade as defined in Section 15.05.[8] Plaintiff flatly misrepresents the terms of the

_____

considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.' The wage requirements of the Act will not be met where the employee 'kicks-back' directly or indirectly to the employer . . . the whole or part of the wage delivered to the employee." 29 C.F.R. § 531.35.

[8] That being the case, the Court need not reach the question of whether, *if* the Agreement is a restraint of trade under Section 15.05, it falls within the exception in Section 15.50 for certain types of covenants not to compete. Ameriflight

- 10 -

Agreement, arguing that it "***explicitly punishes pilots who try to work somewhere other than Ameriflight*** with a severe economic penalty." [Complaint (doc. 1) ¶ 104.] It does no such thing, and certainly does not do so "explicitly" in the ordinary sense of that word. The Agreement *does not prohibit Plaintiff from working for Ameriflight's competitors after leaving Ameriflight.* Plaintiff could have gone to work for a competitor on the day she quit; indeed, it is very possible that she did just that. Plaintiff's obligation to repay some or all of the costs incurred by Ameriflight in providing the training is not tied ***in any way*** to her future work.

20.     The Court in *Heder* sensibly rejected precisely the type of argument Plaintiff is making. In that case, the plaintiff argued that repayment provisions in the relevant contract meant that it was "effectively" a covenant not to compete, which are "lawful and enforceable" in Wisconsin "only if the restrictions imposed are reasonably necessary for the protection of the employer and principal." Wisc. Stat. § 103.465. The Seventh Circuit, construing the Wisconsin statute (which effectively wraps Texas's rule and its exception into one), explained why that argument makes no sense. The court's reasoning is worth considering in detail:

> An agreement to repay [the city] if a firefighter goes to work for a rival fire department would be treated as a covenant not to compete. But the agreement between [the city] and the firefighters' union does not restrict [the employee's] ability to compete against the City after leaving its employ. The obligation is unconditional:  a firefighter departing before three years have expired must repay training costs even if he goes back to school, changes occupation, or retires. ***Competition has nothing to do with the matter.***

*Heder*, 295 F.3d at 780 (internal citation omitted). The district court emphasized that the city's "repayment obligation shares with genuine restrictive covenants the feature that it makes changing jobs costly." *Id.* The Seventh Circuit said that this was "true enough," but "that is not enough to

---

does not seek dismissal on the basis that the Agreement falls within the Section 15.50 exception, inasmuch as resolving that question likely would require extrinsic evidence regarding "reasonableness." Ameriflight's only argument in this Motion is that Section 15.05 does not apply ***at all***.

throw a contract out the window. Employers offer their workers many incentives to stay, so that they can reap the benefit of training and other productivity enhancers that depend on employees' tenure with the firm." *Id.* at 780-781. The court gave the examples of (1) pay that increases with longevity, (2) seniority systems that link duration of service to better assignments, (3) profit-sharing plans and stock options that vest after a period of continued employment, (4) bonuses that accrue after extra years have been served, and most notably, (5) back-loaded pension systems. *Id.* "The common formula that starts with multiplying the final salary by the number of years served produces this effect automatically because salaries tend to rise with inflation and years of service. *Yet no one believes that this powerful financial incentive to stick with one's employer until retirement is unlawful*," even though it is much larger than the employee's repayment obligation. *Id.*

21.     As discussed above in the context of the FLSA claims, the *Heder* court noted that employers, rather than fronting training costs, could require the employees to undergo training at their own expense, or limit hiring to those already trained. "If an employer may  require employees to pay up front, why can't the employer bear the expense but require reimbursement if an early departure deprives the employer of the benefit of the bargain?" *Id.* The answer, at least in *Heder*, was that employers *can* require reimbursement without converting the repayment agreement into a stealthy covenant not to compete.

22.     Texas courts have routinely enforced employment agreements containing the type of "financial incentives" discussed in *Heder*, finding them to be noncontroversial and not anti-competitive. A leading case on point is *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319 (Tex. 2014). Drennen worked for Exxon for 30 years and participated in two stock "incentive programs," pursuant to which he received regular awards of restricted stock. *Id.* at 322. The restrictions would

be removed from 50% of the shares three years after each grant, and from the remaining 50% of the shares after seven years. *Id.* The "incentive programs" also contained a provision permitting Exxon to terminate the outstanding, as-yet-unvested awards if Drennen engaged in "detrimental activity," defined to include becoming employed by a competitor. *Id.*

23.     Drennen resigned his employment in May 2007, at which time he had about 57,000 shares still in the restricted period. *Id.* He told his supervisor that he was considering accepting a position with one of Exxon's chief competitors, and his supervisor "warned him that if he accepted the position, it would be highly likely that Drennen would lose all of his incentives." *Id.* at 322-323 (cleaned up). "Despite this warning," Drennen went to work for the competitor, and Exxon sent him a letter cancelling the unvested incentive awards. *Id.* at 323. He sued to recover the stock and sought a declaratory judgment that the "detrimental activity" provision effectively operated as a non-compete agreement. *Id.*

24.     The "incentive programs" contained a New York choice-of-law provision, and there was little doubt under relevant New York precedent that the "detrimental activity" provision *was* enforceable under New York law. Before deciding whether to apply New York law, the Texas Supreme Court undertook an analysis of the enforceability of the choice-of-law provision, one aspect of which was determining whether enforcement of the contract would be "contrary to a fundamental public policy of Texas." *Id.* at 327. The court recognized that "the law governing enforcement of non-competes is fundamental public policy in Texas," and therefore decided that it "must, then, determine whether the provisions at issue in the Incentive Programs are covenants not to compete." *Id.*

25.     The court first acknowledged the fact that the Covenants Not to Compete Act does not actually *define* covenants not to compete. The court adopted its own definition from a prior

case: "covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the Act." *Id.* (quoting *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011)). "The agreement here, arguably, does not fit within this definition as it does not 'limit' Drennen's professional mobility, per se." *Id.*

26.     After discussing three prior landmark decisions regarding true non-competes, the court found that "it is clear that the agreement here does not fit the mold. . . . Forfeiture provisions conditioned on loyalty . . . do not restrict or prohibit the employees' future employment opportunities. Instead, they reward employees for continued loyalty. As we recognized in *Marsh*, employee stock-ownership plans have a purpose that is unrelated to restraining competition – linking the interest of key employees with the employer's long-term success." *Id.* at 327-328. The court went on:

> It is not necessary here to answer the question of what it means to be a covenant not to compete any more than it was in [prior cases]. Drennen did not promise to refrain from competing with ExxonMobil or refrain from soliciting clients or employees from ExxonMobil. Instead, he agreed that, in reward for his hard work and loyalty, he would receive bonus compensation in the form of stock options. One of the conditions of this bonus compensation was continued loyalty, which was not a promise on Drennen's part, but rather a power reserved to his employer should he opt into the Incentive Programs. If he chose to compete with ExxonMobil (which he did), he would forfeit the shares still in the restricted phase that were to be awarded as bonus compensation. ***There is a distinction between a covenant not to compete and a forfeiture provision in a non-contributory profit-sharing plan because such plans do not restrict the employee's right to future employment***; rather, these plans force the employee to choose between competing with the former employer without restraint from the former employer and accepting benefits of the retirement plan to which the employee contributed nothing. Whatever it may mean to be a covenant not to compete under Texas law, forfeiture clauses in non-contributory profit-sharing plans, like the detrimental-activity provisions in ExxonMobil's Incentive Programs, ***clearly are not covenants not to compete***.

*Id.* at 329. This holding is entirely consistent with the court's reasoning in *Heder* that if "financial incentive" programs like restricted stock options are *not* covenants not to compete, then it must

follow logically that training repayment agreements that do not place any limits on the employee's future mobility are *also* not covenants not to compete.

27.     These principles are not limited to "forfeiture" provisions like those found in *Drennen*. For example, the Houston Court of Appeals did not hesitate to enforce a provision requiring an employee to repay relocation expenses if he resigned before working for a year. In *Dresser-Rand Co. v. Bolick*, No. 14-12-00192-CV, 2013 WL 3770950 (Tex. App.—Houston [14th Dist.] 2013, pet. denied), the employee signed a "Relocation Expense Reimbursement Agreement" when his employer transferred him from New York to Houston. *Id.* at *1. The employer agreed to pay relocation expenses on the employee's behalf, with the proviso that if the employee quit or was terminated for cause within one year of relocating to Houston, he would repay 100% of those relocation expenses. *Id.* The employee quit less than one year after relocating, but refused the employer's demand to "repay more than $30,000 in moving expenses" the employer incurred on his behalf. *Id.* at *2. The parties filed cross motions for summary judgment. The trial court granted the employee's motion and declared, *inter alia*, that the repayment provision constituted a "penalty" or an unenforceable liquidated damages provision.[9] The court of appeals reversed and rendered summary judgment in favor of the employer, concluding that the repayment provision was enforceable and entirely uncontroversial. No suggestion was made that it operated as an unlawful restraint on trade.

28.     Most significantly, the Dallas Court of Appeals addressed a contract very similar to the Agreement, albeit in a slightly different context, in *Ameristar Jet Charter, Inc. v. Cope*, No. 05-99-01875-CV, 2001 WL 950978 (Tex. App.—Dallas Aug. 22, 2001, no pet.). In *Ameristar*, a

---

[9] *See infra* as pertains to Plaintiff's similar argument.

provider of on-demand aircraft charters for freight transportation (much like Ameriflight) entered into an agreement with a pilot to provide him with training to upgrade his "type" rating on a particular aircraft. In return, the pilot "agreed to stay employed with Ameristar for one year or repay $6,000 of the costs of training." *Id.* at *1. The pilot quit shortly after completing the training and went to work for another airline. *Id.* The pilot refused to pay, and the airline sued for breach. *Id.*

29.     The trial court directed a verdict in favor of the pilot – not because the contract was unenforceable in principle, but because the airline had not adequately proved up mutual agreement to all of the contract terms (aspects of the contract were oral). *Id.* The appellate court reversed, holding that the airline had met its burden to prove the existence of a contract to repay $6,000 if the pilot left within one year after receiving the training and obtaining the type rating. *Id.* at *2-3. If the pilot made an argument that the training repayment provision was an illegal restraint of trade, that argument is not discussed in the appellate decision, and *Ameristar* thus stands for the proposition that contracts of the type at issue in the present lawsuit are enforceable in principle under Texas law.[10] Based on all of the foregoing authority, the Court should conclude that the Agreement is not a covenant not to compete or an unlawful restraint on trade, and dismiss Plaintiff's third cause of action.

---

[10] "Specialized training" has been recognized as "an interest worthy of protection" by way of an ***actual*** covenant not to compete, so long as the restrictions against competition are reasonable. *Neurodiagnostic Tex., L.L.C. v. Pierce*, 506 S.W.3d 153, 165 (Tex. App.—Tyler 2016, no pet.) (citing cases). Thus, even if the Court were to construe the repayment provisions in the Agreement as being a disguised covenant not to compete, a finding of unenforceability does not necessarily follow. Ameriflight reserves this argument for a later time, if necessary, but does not present it to the Court for determination in this Motion.

**D.** **The Court should dismiss Plaintiff's claim that the repayment provisions constitute an unenforceable "penalty" because they are *not liquidated damages for breach* and because Plaintiff seeks an improper advisory opinion.**

30.     Plaintiff's fourth and final cause of action asserts that the repayment provision constitutes an "unenforceable penalty" and an "unlawful liquidated damages provision." [Complaint ¶¶ 114- 117.] She seeks a declaration of unenforceability as well as damages in the form of disgorgement of the amounts she has paid, as well as unspecified injunctive relief. *Id.* ¶ 117. The Court should dismiss this cause of action as well, either under Rule 12(b)(6) or under Rule 12(b)(1).

**1.**     **Plaintiff's decision to resign from Ameriflight was not a breach of the Agreement, and the repayment obligation triggered by the timing of Plaintiff's voluntary decision are not "liquidated damages."**

31.     Plaintiff's argument, respectfully, makes little sense. She contends that the Agreement "is an unenforceable penalty. The harm caused by pilots who leave Ameriflight before the end of the two-year TRAP term is not incapable or difficult of estimation, and the amount of liquidated damages Ameriflight charges departing pilots is not a reasonable forecast of just compensation." [Complaint (doc. 1) ¶ 116.] *Plaintiff's decision to voluntarily separate from employment with Ameriflight – for any reason – was not a breach of the Agreement.* Plaintiff was free to quit at any time, and exercised her unfettered right to do so. Plaintiff's obligation to repay the costs of training is not, in any manner, a forecast of "damages" caused by Plaintiff's decision to resign.

32.     In *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 664 (Tex. 2005), the Texas Supreme Court observed that "traditionally, liquidated damages are recoverable only where there

has been a failure to perform contractual obligations." *Id.*[11] In other words, a liquidated damages clause is punishment for breaching a contract. *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 431 (Tex. 2005) ("liquidated damages ordinary refers to an acceptable measure of damages that the parties stipulate in advance will be assessed in the event of a contract breach"). "If damages for the prospective breach of a contract are difficult to measure and the stipulated damages are a reasonable estimate of actual damages, then such a provision is valid and enforceable as 'liquidated damages;' otherwise, it is void as a 'penalty.'" *Id.* (quoting *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991)).

33.    Plaintiff's request for declaratory relief impliedly adopts the framework of these cases, but the argument is premised on the incorrect notion that the repayment obligation was intended as a liquidated damages provision but instead operates as a penalty. ***It is neither.*** Plaintiff did not promise to work for Ameriflight for a certain term. She was free to resign on day one. Plaintiff did not promise Ameriflight that she would not go to work for a competitor. She was free to so at any time after her resignation. Ameriflight does not contend that Plaintiff became liable for repayment of the training costs because of any *breach* on her part. She became liable for repayment because she *agreed* to reimburse those costs to Ameriflight if she voluntarily left employment within a year. The repayment provision cannot be characterized as either "liquidated damages" ***or*** as an unenforceable "penalty."

34.    Time and again, Texas courts have considered and rejected litigants' attempts to characterize run-of-the-mill payment provisions as attempted liquidated damages, in order to lay predicate for arguing that they are *unenforceable* liquidated damages, *i.e.*, that they are an

---

[11] Whether a contract term is a liquidated damages provision is a question of law for the Court to decide. *Id. See also Bose Corp v. Ejaz*, 732 F.3d 17, 24 n. 5 (1st Cir. 2013) (same); *Plaza Athenee, S.E. v. U.S. Fid. & Guar. Co.*, No. Civ.01-2597(PG), 2005 WL 1114368, at *5 (D.P.R. May 9, 2005) (same).

impermissible "penalty." *See, e.g.*, *Tummala v. Total Inpatient Servs., P.A.*, No. 01-14-00458-CV, 2015 WL 5156903, at *8 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, no pet.) (Huddle, J., concurring) (provision allowing a doctor to "buy-out" an otherwise enforceable non-compete for a fixed cash price, agreed in advance to be "reasonable," was not a liquidated damages provision because it was not a payment obligation predicated on breach); *Khan v. Meknojiya*, No. 03-11-00580-CV, 2013 WL 3336874, at * 3 (Tex. App.—Austin June 28, 2013, no pet.) (contractual provision establishing rental rate if tenant fails to surrender premises at end of lease "does not equate to a stipulated measure of damage; rather, it is an agreed-upon rental amount that is due under particular circumstances," and is thus neither an enforceable liquidated damages provision nor an unenforceable penalty); *Sunbelt Servs., Inc. v. Grove Temp. Serv., Inc.*, No. 05-05-00190-CV, 2006 WL 2130144, at *3-4 (Tex. App.—Dallas Aug. 31, 2006, no pet.) (determining that contractual provision was a fee to be charged to one contracting party upon the occurrence of a future event, and therefore was neither liquidated damages or a penalty).

35.     Based on the foregoing authority and the plain language of the Agreement, the Court can and should determine that the challenged provision is not a liquidated damages provision in the first instance, but rather an agreed price to be paid in the event of an occurrence that itself ***does not constitute a breach*** on the part of Plaintiff. Plaintiff's request that the Court declare the provision an unenforceable "penalty" and award disgorgement damages and injunctive relief fails to state a claim upon which relief may be granted.

**2.      Alternatively and in addition, Plaintiff's declaratory judgment action should be dismissed for lack of subject matter jurisdiction because she seeks an impermissible advisory opinion.**

36.     Alternatively and in addition, Plaintiff's request for declaratory judgment is an improper request for an advisory opinion. ***If*** Plaintiff were to stop abiding by the repayment plan she requested and received, and ***if*** Ameriflight were to sue Plaintiff for breach based on that lack

- 19 -

of payment, it would *perhaps* be a partial defense to payment if Plaintiff were to show that $20,000 is not a reasonable estimate of the actual damage caused to Ameriflight by virtue of her failure to repay. That is, *if* Ameriflight were to sue for breach (which it has not done, inasmuch as Plaintiff continues to make regular payments), Plaintiff would be free to argue that $20,000 is a penalty rather than a reasonable forecast of the damages caused by that breach because (so she says) the training actually cost less than $20,000. None of that has occurred. Unless and until Ameriflight sues for breach, there is no ripe controversy between the Parties regarding whether $20,000 is a reasonably accurate estimate of Ameriflight's actual damages for breach. Plaintiff effectively seeks an advisory opinion from the Court.[12]

37. Texas has adopted – and Plaintiff has brought suit under – the Uniform Declaratory Judgments Act. [Complaint (doc. 1) ¶ 117 (invoking Tex. Civ. Prac. & Rem. Code Ch. 37).] The purpose of the UDJA is to "settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Tx. Civ. Prac. & Rem. Code § 37.002(b). "A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties will be resolved by the declaration sought." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). The UDJA does not grant courts the authority to render advisory opinions. *Patterson v. Planned Parenthood of Houston and Se. Tex., Inc.*, 971 S.W.2d 439, 443 (Tex. 1998).[13] Whether under the UDJA or otherwise, "the courts may not review hypothetical or

---

[12] "Penalty" is an affirmative defense, and the party asserting the defense bears the burden of demonstrating that the contractual provision *sought to be enforced by the other party* is an unenforceable penalty rather than an enforceable liquidated damages provision. *See, e.g.*, *Chaudhary v. Mora*, No. 01-21-00352-CV, 2022 WL 322393, at *10 (Tex. App.—Houston [1st Dist.] Aug. 30, 2022, rule 5.37(f) motion granted Mar. 10, 2023).

[13] "The courts of this state are not empowered to give advisory opinions. This prohibition extends to cases that are not yet ripe. A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Id.* at 443. Unless and until Ameriflight sues or threatens to sue Plaintiff for breach, the triggering events have not come to pass. In this regard, it is notable that Plaintiff has not alleged that Ameriflight *ever* made a demand for repayment. Rather, she claims that when she quit, she proactively reached out to Ameriflight to acknowledge the debt and offered to repay it over time.

contingent situations, or determine questions ***not currently essential to the decision of an actual controversy***." *Foust v. Ranger Ins. Co.*, 975 S.W.2d 329, 331-332 (Tex. App.—San Antonio 1998, pet. denied).

38.     Said differently, although the UDJA allows persons interest under a written contract to "obtain a declaration of rights, status, or other legal relations thereunder," it is "merely a procedural advice for deciding cases already within a court's jurisdiction," and "a declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties[.]" *Devon Energy Prod. Co., L.P. v. KCS Resources, LLC*, 450 S.W.3d 203, 210 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443-444 (Tex. 1993); *Bonham*, 907 S.W.2d at 467)). Thus, "a judgment based on an advisory opinion addresses only a hypothetical injury rather than remedying an actual or imminent harm." *Id.* Texas courts would dismiss the declaratory judgment action for lack of subject matter jurisdiction.

39.     The rule is the same in this Circuit. *See, e.g.*, *In re Financial Oversight and Mgmt. Bd. for Puerto Rico*, 594 F. Supp. 3d 433, 442-443 (D.P.R. 2019) (challenges to the Court's subject matter jurisdiction on mootness grounds are proper under Rule 12(b)(1); mootness review is "grounded in the 'case or controversy' requirement under Article III of the United States Constitution . . . and 'ensures that courts do not render advisory opinions") (quoting *Mass. v. United States Dep't of Health & Human Servs.*, 923 F.3d 2019, 220 (1st Cir. 2019); *Overseas Military Sales Corp. v. Giralt-Armada*, 503 F.3d 12, 16-17 (1st Cir. 2007)). Thus, to the extent the Court determines that this is a question of procedure (where the forum's rules apply) rather than a question of substantive law (where Texas law applies), the Court should dismiss pursuant to Rule 12(b)(1) based on the precedent cited immediately above. If the Court considers this a question of

substantive law, the Court should dismiss based on the uniform Texas precedent against barring advisory opinions under its version of the UDJA. The result, in either event, is the same.

### **RELIEF REQUESTED**

For the foregoing reasons, Ameriflight respectfully requests that the Court grant the Motion; dismiss all of Plaintiff's claims, causes of action, and requests for relief pursuant to Rule 12(b)(6) and/or 12(b)(1) for each and all of the reasons set forth herein; award Ameriflight its taxable costs; and grant all other relief, general or special, at law or in equity, to which it may be justly entitled.

In Atlanta, Georgia, for San Juan, Puerto Rico, this 24th day of April 2023.

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel(s) of record.

Respectfully submitted,

**Ogletree, Deakins, Nash, Smoak, & Stewart,
P.C.**

Attorneys for Ameriflight, LLC
One Ninety One Peachtree Tower
191 Peachtree Street, N.E., Suite 4800
Atlanta, GA 30303
Telephone: (404) 260-0657
Fax: (404) 870-1732

<u>*s/Carlos Colon-Machargo*</u>
CARLOS G. COLÓN-MACHARGO
U.S.D.C.-P.R. No. 216809
carlos.colon-machargo@ogletree.com


JOHN M. BARCUS
*Pro Hac Vice Motion Forthcoming*
john.barcus@ogletree.com
SHAINA E. HICKS
*Pro Hac Vice Motion Forthcoming*
shaina.hicks@ogletree.com
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
8117 Preston Road, Suite 500
Dallas, Texas 75225
Telephone:  (214) 987-3800
Fax:  (214) 987-3927

**ATTORNEYS FOR DEFENDANT
AMERIFLIGHT, LLC**