IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| KATHLEEN FREDERICKS<br><br>individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>AMERIFLIGHT, LLC,<br><br>        Defendant. | Case No. 3:23-cv-01042 (PAD) |

**OPPOSITION TO AMERIFLIGHT'S MOTION TO DISMISS**

      Plaintiff Kathleen Fredericks filed this class and collective action on January 30, 2023, alleging that Ameriflight's Training Repayment Agreement Provision ("TRAP") unlawfully requires pilots to pay Ameriflight tens of thousands of dollars if they leave their jobs within 18 months to two years of completing training. The training is of little independent benefit to pilots, and of substantial benefit to Ameriflight itself. That is because the Federal Aviation Administration ("FAA") requires Ameriflight to provide the exact training at issue in this case to every pilot that it hires in order for Ameriflight to lawfully operate—regardless of the pilots' skills and experience, and regardless of whether those pilots have received similar training before from another airline.

      Under the federal Fair Labor Standards Act ("FLSA"), Ameriflight cannot require its employees to pay for expenses that are primarily for Ameriflight's benefit. And Texas law—the law that Ameriflight itself chose to apply to its contracts, regardless of where its pilots flew—prohibits restraints of trade, including contracts that impose a severe economic penalty on employees seeking to change jobs. Ameriflight's Motion to Dismiss disregards the facts pleaded

1

in the Complaint, asks the Court to make findings on disputed facts, and misinterprets both federal and state law in an effort to justify its unlawful contracts. But it cannot. The Complaint states a claim for relief, and the Court should allow Plaintiff's case to move forward.

## I.      Factual Background

### A.      The Training Pilots Received from Ameriflight Was Required of Ameriflight by The FAA.

In order to understand the nature of the training that Ameriflight provides to its pilots, it is necessary to explain how the FAA regulates airlines, as pleaded in the Complaint. Ameriflight is a Part 135 airline, which refers to 14 C.F.R. Part 135, an aviation regulation that applies to certain operators of charter planes. Complaint, ECF No. 1 ¶ 23. The FAA requires companies that operate Part 135 airlines, including Ameriflight, to submit training plans to the agency as part of the process of granting the airlines Part 135 certification. *Id*. ¶ 24. Ameriflight's training plans, which were reviewed and approved by the FAA, require it to provide its pilots with a curriculum that includes a combination of ground and flight training. *Id*. This training cannot be transferred to other Part 135 operators, meaning that if a pilot moves from Ameriflight to another Part 135 operator, that pilot will need to re-do their training—even if the pilot is flying the same aircraft at their new employer. *Id*. ¶¶ 25-26. In other words, the primary value of Part 135 training is to Ameriflight itself, which needs to train its pilots in a certain way in order to operate legally. For pilots, on the other hand, Part 135 training is just another job duty and responsibility in a Part 135 pilot's job description.

### B.      The TRAPs Ameriflight Required Pilots to Sign Punished Them for Leaving Ameriflight Within 18 to 24 Months.

From approximately spring 2020 until spring 2022, Ameriflight required all new hires to sign a Training Repayment Agreement Provision ("TRAP") that required pilots to pay a total

penalty of between $20,000 and $30,000 if they left the company within either 18 or 24 months of starting "revenue flying." *Id*. ¶¶ 44, 48. Revenue flying is a common industry term for flights chartered by paying customers. *Id*. ¶ 49. The TRAP stated that it was for "Repayment of Training Expenses," which included "e-learning, ground/indoctrination class, flight training, Simulator sessions, FAR 135 check ride, and initial operating experience (IOE) flights with a qualified captain." *Id*. ¶ 47.

The TRAP did not explain the relationship between the training provided and the amount charged, and Ameriflight has consistently refused to provide pilots with an accounting of actual training expenses upon request. *Id*. ¶ 54. Upon information and belief, the training cost Ameriflight substantially less than the amount it has attempted to recover from its pilots. *Id*. ¶ 38. In fact, Ameriflight *earned* money off pilots for much of the training period, as several weeks of the training consisted of pilots flying revenue flights under supervision. *Id*.

### C. Ameriflight's Training Was Primarily for the Airline's Benefit.

New pilot hires at Ameriflight during the relevant time period underwent approximately five weeks of training, all of which was required by Ameriflight's Part 135 certification. *Id*. ¶¶ 24, 27. The first week of training, called indoctrination or "indoc," was classroom training on Ameriflight-specific policies and procedures, along with operational specifications, hazardous materials training, and an overview of FAA regulations. *Id*. ¶ 29. Indoc was the same for all Ameriflight pilots. *Id*. After pilots completed indoc, they moved on to ground school systems training, which was specific to the type of aircraft they flew. *Id*. ¶ 30. All Ameriflight pilots flew one of four aircraft models: the Beechcraft 99, the Fairchild SA-227 Metroliner, the Embraer EMB-120 Brasilia, and the Beechcraft 1900. *Id*. ¶ 17. All of these planes have been out of production for at least 20 years. *Id*.

For some pilots, ground school took place at Ameriflight headquarters, and for others, it took place at third-party facilities. *Id*. ¶ 30. All ground school training, including the training at third-party flight schools, used curriculum specific to Ameriflight, rather than general flight-school curriculum. *Id*.

Following ground school, Ameriflight pilots moved on to flight simulators. *Id*. ¶ 31. The simulators Ameriflight used for its training were old and often ran on outdated software, and pilots could face long waits for them to become available. *Id.* ¶¶ 31-35. Once pilots had flown a few flights on simulators, they began "Initial Operating Experience" ("IOE") flying, which took place on Ameriflight planes with a training captain in the plane with them. *Id*. ¶ 36. Although a small portion of IOE flying took place without cargo, the significant majority of IOE flights were supervised revenue flights. *Id*.

### D.     Ameriflight Aggressively Collected TRAP Debt from its Employees.

Ameriflight pilots who left their jobs at the company within two years of completing IOE received a letter from Ameriflight Human Resources Manager Scott Macduff requesting payment of the outstanding TRAP amount within 30 days. *Id*. ¶ 55. The letter from Mr. Macduff informed pilots that failure to pay the full amount due could result in their being sent to collections or sued. *Id*. ¶ 56. Many pilots, including Plaintiff Fredericks, negotiated a payment plan directly with Ameriflight, while others found their debts were sent to collections. *Id*. ¶¶ 57, 69. As of the filing of the Complaint, Plaintiff had paid Ameriflight $3,250. *Id*. ¶ 70.

## II.    Legal Standard

In order to survive a motion to dismiss, a plaintiff must plead facts that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "In adjudicating a motion under 12(b)(6), courts ask 'whether the well-pleaded factual allegations,

4

viewed in the light most favorable to the plaintiff, state a claim for which relief can be granted.'" *Wilmington Sav. Fund Soc'y, FSB v. Rosado-Muñoz*, No. 17-cv-1880, 2018 WL 1115678, at *2 (D.P.R. Feb. 27, 2018) (quoting *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017)).

### III.   Argument

Ameriflight's muddled motion repeatedly misses the point of Plaintiff's claims. These claims are based on straightforward principles: Employees are paid to work; they do not pay to work. And, in an at-will system, when either employer or employee reaches the end of an employment relationship, that relationship is over. Ameriflight has sought to turn these two principles on their head, purporting to place its pilots in tens of thousands of dollars' worth of debt for job-specific training that it then holds over the pilots' heads if they seek better conditions of employment. The Complaint properly pleads claims that this practice is illegal under both federal and state law.

### A.   Plaintiff Has Stated a Claim Under the FLSA Because Ameriflight's Training is Primarily for the Benefit of the Employer.

The crux of Plaintiff's FLSA claims is that Ameriflight unlawfully required its pilots to pay for training that was primarily for Ameriflight's benefit. By requiring pilots to pay tens of thousands of dollars in supposed compensation for training that was far more valuable to Ameriflight than it was to Ameriflight pilots, Ameriflight violated the FLSA by failing to pay pilots free and clear, and by requiring pilots to kick back their paid wages to Ameriflight. Plaintiff has stated a claim for relief in accordance with these principles, and Ameriflight's attempt to argue otherwise fails to understand either the law or the facts under which this action arises.

The FLSA requires employers to "provide workers' weekly wages 'in cash or in facilities', 'free and clear' of improper deductions, at a rate no lower than the minimum wage

5

rate." *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1235 (11th Cir. 2002) (quoting 29 U.S.C. § 206(a)(1); 29 C.F.R. §§ 531.35, 776.4); *see also Davis v. Colonial Freight Sys., Inc.*, No. 3:16-CV-674, 2017 WL 11572196, at *6 (E.D. Tenn. Nov. 22, 2017) ("[B]ecause he alleges Defendants required repayment of alleged wages already delivered to him, Plaintiff pleads sufficient facts to support a claim that Defendants did not deliver the minimum wage 'free and clear.'"); *Perez v. Westchester Foreign Autos, Inc.*, No. 11 CIV. 6091 ER, 2013 WL 749497, at *9 (S.D.N.Y. Feb. 28, 2013) (holding that the "free and clear" requirement was violated by a policy that required employees to pay back a draw on commission). The FLSA's implementing regulations also make it unlawful for employers to require their workers to "kick-back," either "directly or indirectly," money that would bring employees' pay below the minimum wage for a given workweek. 29 C.F.R. § 531.35; *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 897 (9th Cir. 2013) ("[E]mployers generally may not issue paychecks at the minimum wage rate and then require employees to give some of the money back").[1]

A wage deduction or kickback is "improper" unless it is (1) for board, lodging, or "other facilities"; (2) primarily for the benefit or convenience of the employee and not the employer; and (3) voluntary and not coerced. 29 U.S.C. § 203(m); 29 CFR § 531.3(d)(1); 29 C.F.R. § 531.30; 29 CFR § 531.32; 29 CFR § 531.36. Deductions can be "either actual or de facto."

---

[1] Ameriflight suggests in a footnote that Plaintiff's claims for unlawful kickbacks and failure to pay wages free and clear are "two sides of the same coin." Motion to Dismiss ¶ 16 n.7. This is incorrect and a fundamental misreading of the Complaint. Plaintiff's claim for a kickback violation is based on the allegation that "[k]icking back . . . training costs [by making monetary payments] to Defendant takes employees' wages below minimum wage in their final week of work, resulting in a minimum wage violation for that week." Complaint ¶ 88. The claim for a free and clear violation is based on the allegation that "Defendant maintained and enforced a policy under which the wages paid to employees during every pay period were paid conditionally, subject to the requirement that they not leave their jobs." *Id.* ¶ 97. These are different violations for different workweeks based on different parts of the FLSA's implementing regulations and predicated on different facts.

*Gaxiola v. Williams Seafood of Arapahoe, Inc.*, 776 F. Supp. 2d 117, 126 (E.D.N.C. 2011). Whether an expense is primarily for the benefit of the employer is a fact-specific inquiry that considers factors such as whether or not the expense was "an incident of and necessary to the employment." *Arriaga*, 305 F.3d at 1241 (quoting 29 C.F.R. § 531.32(a)). Put differently, "costs arising from the employment itself" are subject to the limitations of the FLSA, whereas costs "that would arise in the course of ordinary life," meaning "universally ordinary living expenses that one would incur in the course of life outside of the workplace," can lawfully be recovered by an employer. *Id*. at 1242-43. "[E]xpenses that are created by the employer because of the nature of the employer's business, or expenses which the employer brings upon himself by the way he chooses to conduct his business, are primarily for the benefit of the employer." *Salazar-Martinez v. Fowler Bros.*, 781 F. Supp. 2d 183, 195 (W.D.N.Y. 2011); *see also* 29 C.F.R. § 531.35 (providing as an example that the cost of "tools of the trade" cannot be deducted from an employee's wages).

Here, the Complaint more than adequately pleads that Part 135 training is primarily for Ameriflight's own benefit. Ameriflight needs its pilots to go through this training in order for Ameriflight to legally operate. Complaint ¶¶ 24-26. Importantly, even if pilots had undergone Part 135 training at another airline, *they would have to undergo it again at Ameriflight*, because completion of the training attaches to the airline and not the pilot. *Id*. ¶¶ 25-26. Although some—but not all—pilots earn a type rating, there is no portable credential associated with the Part 135 training itself, and the type ratings that pilots earn from Ameriflight are of limited value given Ameriflight's out-of-date fleet. *Id*. ¶¶ 26 & 40-41.[2]

---

[2]     "A type rating is an additional certification, beyond a commercial pilot's certificate, that allows pilots to captain a specific make and model of an aircraft. For example, a pilot who wants to captain an Airbus A320 must receive an Airbus type rating that encompasses the A319, A320,

These facts sharply distinguish this case from *Gordon v. City of Oakland*, 627 F.3d 1092 (9th Cir. 2010) and *Heder v. City of Two Rivers, Wisconsin*, 295 F.3d 777,(7th Cir. 2002), which form the basis for Ameriflight's entire argument for dismissal of Plaintiff's FLSA claims. As an initial matter, *Heder* does not apply the FLSA to training repayment costs—rather, the relevant claims in *Heder* arise under and interpret Wisconsin law regarding covenants not to compete, which is not at issue in this case. 295 F.3d at 778. Moreover, the training in *Heder* was transferrable, which formed a key part of the court's analysis: The City of Two Rivers required its firefighters to receive paramedic certification, which "would give each firefighter a portable credential," and instituted a policy that any firefighter who left their employment within three years of receiving that credential would have to repay its cost. *Id*. The court reasoned that this policy did not create an unlawful non-compete under Wisconsin law because the city could "require the employees to undergo and underwrite their own training, with *none* of the time compensated," much like "law firms do when they limit hiring to persons who already have law degrees." *Id*. at 781.

This reasoning simply does not translate: Ameriflight could *not* "require the employees to undergo and underwrite their own training," *id*. at 781, because that would not meet Ameriflight's needs or legal obligations. First, no pilot would choose to undergo Ameriflight's Part 135 training if they were not already employed by Ameriflight, because it is not a portable credential. Second, Ameriflight pays pilots an hourly wage during Part 135 training, Complaint ¶ 37, because it recognizes that pilots are its employees during training and it has an obligation to

---

A321 aircraft types." Complaint ¶ 22. Ameriflight does not argue that whether a pilot receives a type rating makes any difference to the value of the training it provides. And, as the Complaint pleads, the type ratings Ameriflight pilots receive "do[] little to benefit the pilot outside of their employment with Ameriflight" and serve the primary purpose to "satisfy Ameriflight's obligations under Part 135." *Id*. ¶ 41.

pay them for this "time given by the employee to the employer." *Skidmore v. Swift & Co.*, 323 U.S. 134, 138 (1944). Extending the law school analogy from *Heder*, Ameriflight's TRAP is not at all like a law firm requiring an associate to already have a law degree; rather, it is like a law firm holding a first-year associate liable to the law firm for learning how to use the firm's copy machines, after-hours access codes, and case management and document review systems, as well as for partners' time supervising the associate.

In *Gordon*, meanwhile, the plaintiff was a police officer who was required to pay for "a pro rata share of her police academy training costs" if she left the police within five years of completing police academy. 627 F.3d. at 1093. The Ninth Circuit held that the anti-kickback provision of the FLSA did not apply to the repayment because Oakland had "elected to essentially loan police officer trainees . . . the cost of their police academy training" instead of "requiring applicants to independently obtain their police training prior to beginning employment." *Id*. at 1096. This holding reflects that California police officers are required to obtain a certification called a POST certification to in order to be eligible for state employment. *Id*. at 1096 and n.5. Oakland opted to allow its officers to earn that certification after employment instead of "only hiring individuals already possessing a POST certification." *Id*. By contrast, Ameriflight had no such option, because it was required by law to provide the training itself. Complaint ¶¶ 24-25. Moreover, the POST certification training provided the *Gordon* plaintiff with a portable credential, whereas completion of Ameriflight's Part 135 training does not.

Ameriflight also suggests that it is not liable under the FLSA because the debt owed by its employees was not deducted directly from their paychecks, but rather pursued separately after the end of their employment. This is a distinction without a difference. *See, e.g.*, *Arriaga*, 305 F.3d at 1236 ("[T]here is no legal difference between deducting a cost directly from the worker's

9

wages and shifting a cost, which they could not deduct, for the employee to bear."); *Gaxiola*, 776 F.Supp.2d at 126 (employers are responsible for "actual or de facto" improper deductions from employee pay); *see also* 29 C.F.R. § 531.35 (kickbacks are unlawful "*whether the 'kick-back' is made in cash or in other than cash*." (emphasis added)).[3]

### B. Texas Law Bars Damages Provisions That Impose a "Severe Economic Penalty" on Departing Employees.

Under the Texas Free Enterprise and Antitrust Act, "[e]very contract . . . in restraint of trade or commerce is unlawful." Tex. Bus. & Comm. Code § 15.05(a). This law reflects the principle that "a person's right to use his own labor in any lawful employment is . . . one of the first and highest of civil rights." *Rieves v. Buc-ee's Ltd.*, 532 S.W.3d 845, 850 (Tex. App. 2017) (quoting *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 776 (Tex. 2011)). "[C]ovenants limiting employees' professional mobility are unlawful restraints of trade under this statute unless they fall within the exception created by the Covenants Not to Compete Act." *Id*. The Covenants Not to Compete Act provides that non-compete agreements are illegal restraints of trade unless they fall under a narrowly-drawn safe harbor for agreements that (a) are "ancillary to or part of an otherwise enforceable agreement," and (b) "contain limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Comm. Code § 15.50(a).

Texas courts have repeatedly confirmed that the Free Enterprise and Antitrust Act applies "not only to provisions that expressly limit a former employee's professional mobility, but also to

---

[3] Ameriflight also suggests, without legal support, that Plaintiff's partial payment of the debt is an admission of the debt's legitimacy. This is legally and logically wrong. There are many obvious reasons why one would agree to pay a debt she knew was unlawful, including to keep that debt from being sent to collections.

10

damages provisions that impose a severe economic penalty on a departing employee." *Rieves*, 532 S.W.3d at 851 (2017) (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991) (liquidated damages provision was a restraint of trade even though it did not "expressly prohibit" the provision of services to clients of the defendant's former employer)); *see also Frankiewicz v. Nat'l Comp Assocs.*, 633 S.W.2d 505, 507 (Tex. 1982) (agreement that departing employee would forfeit vested commissions in event of competition was unenforceable)). This is because "[t]he practical and economic reality" of penalty clauses inhibit employee mobility in "virtually the same [manner] as a covenant not to compete." *Haass*, 818 S.W.2d at 385-86.

For example, the court in *Rieves v. Buc-ee's* examined a provision much like the one at issue here and found it unlawful. The plaintiff in that case was paid a monthly bonus of approximately $1,500, with the proviso that if she left her employment within 60 months of starting work or provided less than 6 months' notice of her departure, she would have to repay the full bonus amount. 532 S.W.2d at 847. The court held that this "impose[d] a severe economic penalty on [the plaintiff] if she exercise[d] her right as an at-will employee to quit her employment," and therefore violated the Free Enterprise and Antitrust Act. *Id*. at 851. Further, the safe harbor under 15.05(a) was inapplicable because the plaintiff would be required to repay her bonus with no regard to "whether her new employment involves certain competitive activities or is located within certain areas," whether she quit or was terminated, and whether she quit "to take a non-competing job—or no job at all." *Id*. at 851-52.

In accordance with this precedent, Plaintiff squarely states a claim. Ameriflight's $20,000 to $30,000 penalty clause "impose[s] a severe economic penalty" on pilots who attempt to leave their jobs within two years of completing training. *Rieves*, 532 S.W.3d at 851; Complaint ¶¶ 56,

66, 69, 108.[4] The "practical and economic reality" of this penalty is that pilots are pressured to continue working for Ameriflight. *Haass*, 818 S.W.2d at 385-86; Complaint ¶ 5. And the TRAP contains *no* limitations as to geographical area or scope of activity, meaning that the safe harbor under Section 15.50(a) does not apply. *See* Tex. Bus. & Comm. Code § 15.50(a); Complaint ¶¶ 52, 107. Pilots are penalized for leaving their jobs regardless of why they do so and where they work next. Ameriflight itself concedes as much in its briefing. *See* Motion to Dismiss, ECF No. 22 ¶ 19 ("Plaintiff's obligation to repay some or all of the costs incurred by Ameriflight in providing the training is not tied ***in any way*** to her future work." (emphasis in original)).

Bizarrely, Ameriflight does not acknowledge the wealth of authority holding that agreements like the TRAP are prohibited by the Texas Free Enterprise and Antitrust Act. Instead, it rests its argument on the Seventh Circuit's interpretation of Wisconsin law in *Heder*. It goes without saying that this is not persuasive (or any) authority on Texas law.[5] And, for the reasons set forth above, even if it were, *Heder* is not applicable to the facts of this case.

The Texas cases that Ameriflight cites fare no better. *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319 (Tex. 2014) addresses whether a policy of cancelling unvested stock shares for employees who go to work for a competitor violates Section 15.05(a). As the *Rieves* court noted in holding that case inapplicable, *Drennen* involved the cancellation of future payments of

---

[4]     Ameriflight accuses Plaintiff of "flatly misrepresent[ing]" the TRAP by alleging in the Complaint that it "explicitly punishes pilots who try to work somewhere other than Ameriflight with a severe economic penalty." Motion to Dismiss ¶ 19. In so arguing, Ameriflight appears to suggest that a $20,000 to $30,000 fine is not a punishment because it is not a categorical ban on working for a competitor. *Id*. This is nonsensical and conflates the word "punishes" with the word "prohibits." They are not the same word—but, as set forth in this brief, Texas law bars them both.

[5]     Notably, the Wisconsin non-compete law that *Heder* analyzes is an employment law. *See* Wisc. Stat. § 103.465. Wisconsin does have a competition law similar to the Free Enterprise and Antitrust Act, *see* Wisc. Stat. § 133.03, but the *Heder* court does not analyze it.

12

unvested stock, rather than the return of money that had already been paid to the employee. *Rieves*, 532 S.W.3d at 852. Moreover, as *Rieves* notes, stock forfeiture provisions like the one at issue in *Drennen* involve fundamentally different considerations and motivations from unlawful restraints of trade like the TRAP:

> Non-competes protect the investments an employer has made in an employee, ensuring that the costs incurred to develop human capital are protected against competitors who, having not made such expenditures, might appropriate the employer's investment. Forfeiture provisions conditioned on loyalty, however, do not restrict or prohibit the employees' future employment opportunities. Instead, they reward employees for continued employment and loyalty. As we recognized in Marsh, employee stock-ownership plans have a purpose that is unrelated to restraining competition—linking the interest of key employees with the employer's long-term success. Under a non-compete, the former employer can bring a breach of contract suit to enforce the clause. But under a forfeiture provision, the former employer does not need to take legal action because the profit-sharing plan belongs to the employer.

*Id*. at 852-53 (quoting *Drennen*, 452 S.W.3d at 327-28).

Here, Ameriflight is attempting to collect money it already paid to its pilots when those pilots "exercise [their] at-will employment right to change jobs," *id*. at 853, not simply declining to provide pilots with additional compensation in the future. The TRAP does nothing to "link[] the interest of key employees with the employer's long-term success." *Id*. And, unlike in *Drennen*, the TRAP was intended by Ameriflight to "protect the investments an employer has made in an employee" through punitive repayment obligations if the employee leaves their employment. *Id*.; *see also*, *e.g.*, Complaint ¶¶ 5, 52, 104. Ameriflight implicitly concedes as much in its motion, justifying the TRAP because Plaintiff "received the training, became qualified, and then quit Ameriflight for another job opportunity." Motion to Dismiss ¶¶ 1-2. Texas law does not permit employers to protect such purported investments with non-compete agreements unless those agreements fall within the Section 15.50(a) safe harbor. The TRAP does not.

The other cases that Ameriflight cites do not involve claims under either the Texas Free Enterprise and Antitrust Act or the safe harbor created by Section 15.50(a) at all. In *Dresser-Rand Co. v. Bolick*, No. 14-12-00192-CV, 2013 WL 3770950 (Tex. App. July 18, 2013) the plaintiff argued that an agreement that provided for a relocation bonus that could be clawed back if an employee quit within a year of receiving the bonus was an unlawful penalty rather than liquidated damages. *Id*. at *3. The court rejected the notion that the repayment of the relocation bonus was liquidated damages in the first place, meaning that it could not be an unlawful penalty. *Id*. at *5. This holding says nothing about whether Ameriflight's TRAP is unlawful under Texas unfair competition law. And as Ameriflight itself acknowledges, *Ameristar Jet Charter, Inc. v. Cope*, No. 05-99-01875-CV, 2001 WL 950978 (Tex. App. Aug. 22, 2001) was a breach of contract case, with no indication that claims remotely like those at issue here were ever raised by either party. Rather, the case analyzed whether a sufficiently definite contract existed between the parties, *id*. at *3-4, and also upheld the jury's verdict in favor of the pilot defendant on quantum meruit, *id*. at *5-6. Here, Plaintiff does not argue that there was no contract or raise any quantum meruit claims. She argues that the TRAP is unenforceable under well-established Texas law, and Ameriflight has pointed to no authority to the contrary.

  **C.**  **Plaintiff Has Pleaded That the TRAP Constitutes an Unlawful Penalty.**

Ameriflight's argument that the TRAP was not an unlawful penalty provision misunderstands how liquidated damages work. It argues, in effect, that because the penalty for failing to stay employed with Ameriflight for a certain period of time after training was written into the contract, the TRAP was simply a contractual term, and could not have been intended as liquidated damages. This makes little sense: By definition, all liquidated damages clauses (or, as here, unlawful penalty clauses masquerading as liquidated damages clauses) are contractual

14

terms that set forth a monetary consequence for not meeting an obligation set forth in the contract. *See* Black's Law Dictionary (defining liquidated damages clause as "[a] contractual provision that determines in advance the measure of damages if a party breaches the agreement."); *see also Khan v. Meknojiya*, No. 03-11-00580-CV, 2013 WL 3336874, at *3 (Tex. App. June 28, 2013) ("The term 'liquidated damages' ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach.").

Here, the TRAP requires pilots to pay a predetermined amount—between $20,000 and $30,000—if they breach the part of the employment agreement that requires them to stay at Ameriflight for eighteen months to two years after completing training. Complaint ¶ 2; *see also* Training and Employment Agreement, Exhibit A to Motion to Dismiss, ECF No. 22-1. In other words, the contract "determines in advance the measure of damages," Black's Law Dictionary, if a pilot fails to meet the contract's requirement to stay at Ameriflight for a predetermined period of time.[6] The distinction Ameriflight attempts to draw between prohibiting pilots from leaving and fining them if they do leave does not change this analysis: Plaintiff did not have an "unfettered" right to leave Ameriflight, *see* Motion to Dismiss ¶ 31, because she had to pay a penalty to do so. Those facts are sufficient to plead a cognizable claim for an unlawful penalty under Texas law.

The cases Ameriflight cites are not to the contrary. Disingenuously, the section of *Tummala v. Total Inpatient Servs., P.A.*, No. 01-14-00458-CV, 2015 WL 5156903 (Tex. App. Aug. 27, 2015) that Ameriflight cites is a concurrence, not the majority opinion. *Id*. at *8. And

---

[6] To the extent that Ameriflight is trying to make the implausible argument that the round $20,000 to $30,000 damages amount reflects its actual damages, somehow determined in advance, it may seek to develop such evidence in discovery, but the Complaint adequately pleads that this amount is arbitrary and inflated. *See* Complaint ¶ 53. That is all that is required to survive a motion to dismiss.

that concurrence addresses a very different contract than Ameriflight's. The *Tummala* contract included a provision that allowed the plaintiff to buy out a non-compete for $100,000. *Id*. However, if the plaintiff violated the non-compete and the defendant sought recovery, the defendant would still have to prove actual damages. *Id*. Not so here, where the damages amount was set in advance.

Meanwhile, in *Khan*, 2013 WL 3336874, the court concluded that a contract provision that required a tenant to pay double his normal rent—in *addition* to damages—for failure to vacate at the end of a lease was not a liquidated damages clause because it "simply set forth the parties' agreed rental rate for any holdover period." *Id*. at *3. This case stands for the principle that rent set by lease is not liquidated damages, it is rent. This rule has no application to the current case. And in *Sunbelt Servs., Inc. v. Grove Temp. Serv., Inc.*, No. 05-05-01090-CV, 2006 WL 2130144 (Tex. App. Aug. 1, 2006), the court examined an employment agency contract that charged employers hourly for temporary employees and a placement fee if the employer hired the employee permanently within one year of temporary placement. The court held that the placement fee was not a liquidated damages provision; rather, it was a charge for the primary service of the employment agency, which was placing employees with employers. *Id*. at *3. Here, Ameriflight is an airline—it does not and cannot argue that it is a training company, or that the penalty clause is simply a charge for an independent service it provides.

> **D.    Plaintiff and the Class Have Experienced and Are Continuing to Experience Harm from Ameriflight's Unlawful Policies.**

Ameriflight's final argument is, in essence, that Plaintiff has not suffered any harm and therefore seeks an improper advisory opinion with respect to her request for declaratory relief. But, as pleaded in the Complaint, as of January 2023, Plaintiff has paid Ameriflight approximately $3,250 in monthly installments of $250. Complaint ¶ 70. The Complaint avers

16

that "[t]his is a significant expense in her life, preventing her from saving money towards a down payment for a home or other life expenses." *Id*. In other words, Plaintiff has lost several thousand dollars to payments for an invalid debt. It is difficult to imagine a more clean-cut harm.

And, even if Plaintiff had not paid a cent, the Texas declaratory judgment statue applies "to afford relief from insecurity with respect to rights, status, and other legal relations." Tex. Civ. Prac. & Rem. Code § 37.002(b). To the extent federal law applies instead, Ameriflight recognizes that the standard for a declaratory judgment is the same. *See In re Financial Oversight and Mgmt. Bd. for Puerto Rico*, 594 F. Supp. 3d 433, 442-43 (D.P.R. 2019) (describing the Article III case or controversy requirement); Declaratory Judgment Act, 28 U.S.C. § 2201 ("[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."). The Complaint alleges that the debt Ameriflight seeks to collect (or has, in full or in part, collected, *see* Complaint ¶ 57) from Plaintiff and the Class and Collective is invalid under several federal and state laws. Ameriflight disagrees. A judgment in this case will settle that uncertainty, and this Court has the power to render it. *See, e.g.*, *Salazar-Martinez*, 781 F. Supp. 2d at 189 (holding that whether the defendant had violated the FLSA's anti-kickback provision and New York wage laws was an actual controversy as to which the court could issue a declaratory judgment); *see also* Fed. R. Civ. P. 57 advisory committee note to 1937 adoption ("The existence or non-existence of any right, duty, power, liability, privilege, disability, or immunity or of any fact upon which such legal relations depend, or of a status, may be declared.").

## IV.   Conclusion

Plaintiff has stated a claim for relief as to all of her causes of action. She respectfully requests that the Court deny Ameriflight's Motion to Dismiss in its entirety.

Date: May 26, 2023

Respectfully submitted,

*/s/ Rachel W. Dempsey*
Rachel W. Dempsey (admitted *pro hac vice*)
rachel@towardsjustice.org
David Seligman (admitted *pro hac vice*)
david@towardsjustice.org
TOWARDS JUSTICE
PO Box 371680, PMB 44465
Denver, CO 80237-5680
Tel: (720) 441-2236

*/s/ Myriam E. Matos-Bermúdez*
Myriam E. Matos-Bermúdez
mmatos@dtslaw.com
DTS LAW LLC
221 Ave Ponce de León Ste 801
San Juan, PR 00917-1804
Tel: (787) 754-8700

Rachel Smit (admitted *pro hac vice*)
rachel@fairworklaw.com
FAIR WORK, P.C.
192 South St. Suite 450
Boston, MA 02111, USA
Tel: (617) 841-8188

Persis Yu (admitted *pro hac vice*)
persis@protectborrowers.org
STUDENT BORROWER PROTECTION CENTER
(a fiscally sponsored project of Shared Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, DC 20036
Tel: (202) 670-3871

Ashley Tremain (admitted *pro hac vice*)
ashley@tremainartaza.com
TREMAIN ARTAZA PLLC
4925 Greenville Ave Ste. 200
Dallas, TX 75206
Tel: (469) 573-0229

*Attorneys for Plaintiff and the Putative Class and Collective*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel(s) of record.

Date: May 26, 2023

*/s/ Rachel W. Dempsey*
Rachel W. Dempsey